0-9-0-7-3-8, people representing DeShanto, Young. For the defendant. Morning. Hold on. My name is Pamela Rubio for DeShanto, Young. Your Honor, I'm Margaret Smith, Assistant State Attorney representing the people of the State of Illinois. Okay. I can assure you we've all read the briefs. We've looked at the pertinent portions of the records. You do have 15 minutes aside. Epelantyi, time for reply. We don't look at our watches here, but it would help if we got right to the strongest point first. There's a lot of issues in this case, so it would help us if you'd try and narrow that down a little bit. But anytime you're ready, Ms. Rubio. Okay. May it please the Court? In rebuttal, I'd like to reserve a few minutes. Certainly. As Justice Quinn mentioned, there are five issues in DeShanto, Young's appellate brief. Today I will focus on three of those issues, the first being that he was not proven guilty beyond a reasonable doubt, that the Court erred in denying his post-trial motion, and that the unreliable lineup evidence was inadmissible because it was illegally obtained in violation of the eavesdropping statute. However, I'm prepared to answer any questions on the other issues. In this case, no one ever identified the shooter or shooters by sight. No physical evidence was presented connecting a suspect to the shooting. Well, they had the proceeds, right? So the proceeds being the gun. One of the victims' gun was found in Mr. DeShanto's car, in which Mr. DeShanto Young was a passenger. That is correct. It was found under the hood of the car in which he was a passenger, but it was nine days after the shooting. And there were no prints recovered from the gun. And the car that he was a passenger in was not his car. No inculpatory statements were ever made by anyone in this case. And the extremely general description provided of the suspect or suspects did not point to any particular individual. DeShanto Young, the state suspect, was never connected to the getaway car, which was a green sedan, was never connected to the second unknown gunman or to the driver of the getaway car, and he was never connected to Brandon Bell, whom the victims thought may have been responsible for the attack. The main evidence presented at the trial were two unreliable voice identifications derived from a sham voice lineup. A sham voice lineup? The circumstances surrounding the lineup and the events leading up to the lineup suggest or illustrate the results on reliability. All four witnesses to the shooting, who all knew DeShanto Young from the neighborhood, did not tell the police on the night of the shooting that they knew who the shooter was or recognized his voice. In fact, three of the four witnesses specifically told the police, no, we don't know who the shooter was. It was not until 12 days after the shooting that the first witness comes forward telling the police, yeah, now I think I recognize the shooter's voice. Ms. Rubio, isn't it after the shooter, the defendant had gone back to the scene and jogged his memory, for lack of a better term, spoken to the witnesses and asked how is your brother or whatever he asked, but by coming back and talking to that person, didn't that revive the memory in some way? We would say it did not because, first of all, DeShanto Young came by the day after the shooting to talk to the victim's cousin, who was not at the scene of the shooting, and asked about Willie's well-being. He had heard that he was in the hospital and asked about him. He made no threats. He made no innuendo. He just said to Bobby, you know, tell your cousin I came by asking about Willie. He was in a black Toyota, wasn't he? I'm sorry? He was in a black Toyota at that time? He was, and the witnesses said that they had seen him driving around in the neighborhood in that black Toyota. But again, that Toyota was never directly connected to the crime. And the fact that he came by the day after was, you know, no testimony other than his words that were completely innocuous about, you know, asking about how Willie was doing. He had heard that he was in the hospital. Wasn't there a physical description that was given the night of the murder that falsely matched the defendant? It was a very general description that was given of a black man that was about 200 pounds, maybe between 5'9 and 6'1, and wearing a black mask and black clothing. Braids? Well, the braids fact never came out until the actual day of the trial, so none of the witnesses in any of the interviews before the trial mentioned that either of the shooters had braids. And again, we don't even know how many shooters there were. One witness said that there were two shooters. Another said that there was only one. What difference would it make? It goes to their credibility. It goes to how they could remember the facts. How could they have remembered the shooter's voice if they couldn't even remember how many shooters there were? Let me answer this, and I'm apologizing for using people's first names, but Willie. Yes. Did he say he knew Sean's voice because he had heard him or encountered him 20 different times? He said that he had never actually had a conversation with DeShonta Young. He knew him from the neighborhood, and the only time he had ever heard him speak was 10 to 20 times around the neighborhood talking to other people on the street from several feet away. Or asking for squares. Asking for squares. I believe Kenyatta said that maybe they exchanged words asking for squares. But that's a very low familiarity or acquaintance. In terms of voice identification, as odd as it sounds, when one first reads the white brief, it's like, holy cow, how could anybody be convicted based on a voice identification? And you look at the cases, and there are complete strangers convicted based on voice identifications. There's a few more words than were exchanged here, but complete strangers. We've affirmed, not us, but this court, years past, has affirmed convictions based on cashiers saying, I recognize his voice. I believe that that case that you're referring to is, if I have it right, I'm sorry, I don't remember the name of the case, but I believe that in that case, it was the same day of the shooting, and the cashier spoke to the defendant who had come in earlier that day, had communicated one-on-one, had seen his build, and then he left and then he came back. In this situation, you know, the circumstances surrounding the ability to listen, you know, the Neal versus Biggers factors talk about eyewitness identification, but they're easily applied to this situation. You know, the scene was chaotic. Kenyatta said that his degree of attention was on the safety of his friends. People were jumping out of windows. Gunfire was being had. That's true of every shooting, right? I mean, every shooting, theoretically. It's really chaotic. People are screaming, diving out windows. Right. But in this case, it's different because we're not dealing with a visual identification. We're dealing with... Well, they point to him in court, do they not? And after the voice identification, they said it was Sean. And Willie said, right after he heard Sean got locked up in Harvey, he said, oh, I'll tell the police it was Sean from the neighborhood. Well, their voice, I'm sorry, their identifications in court were a result of the lineup procedure that was conducted. After this unusual voice lineup that was conducted, the assistant station... But he is Sean, right? Everybody agrees he's Sean. Yes. And he's from that neighborhood, including the recanter, said, oh, yeah, it's Sean from the neighborhood. Right. But this is after, like I said, 12 days between the shooting and the first time someone mentions recognizing the shooter's voice, during which the testimony shows that the witnesses were talking to one another about who could have been behind the shooting, rumors were being spread on the street about who might have been responsible. Then Willie hears that DeShanta gets arrested in Harvey and... What's the significance of that, counsel? What's the significance of the 12 days? You mentioned that a couple of times. What's the significance? Well, if they were so familiar with the shooter's voice, why didn't they say that to the police right away, especially when the police directly asked them, do you know who the shooter was? No, we don't know who the shooter was immediately after the shooting. And the 12 days are important because within those 12 days, Kenyatta tells Martin that he thought the shooter was DeShanta Young after Bobby tells them that he came by asking about Willie. The seed was planted that maybe everybody got together and started thinking, yeah, that could be DeShanta Young, and then they convinced themselves. Wasn't this argued in the trial court, this very argument that you're making? Well, it was argued that the lineup results were not credible and that he was not proven guilty, yes. But, I mean, the theory that you're now putting forward that perhaps they all got together and concocted the story that it was Sean that was really somebody else after all. Was that argued in the trial court? I don't recall if those specific arguments were made, but I believe that it was a misidentification defense. So, in essence, yes. He had five bullets in him, so when the police see him at the ER, he's got five bullets in him, he's on a gurney, he gets intubated after they ask him, do you know DeShanta? No. And he didn't remember when he called the police later, hey, did I see police today? I got shot at. Wow, I'm surprised. And yet he remembered many details of the shooting when he was interviewed that night before he was intubated. The police testified that he was able to tell them who was present, that they were playing video games, that they were smoking marijuana, who was going to leave to go buy snacks, and when the shooter came in. He remembered details about being behind James Perkins as he was firing a weapon towards the shooters, and that they jumped out the window. He remembered all those details, and yet he failed to mention when questioned by the police that the key component, which was, yes, I know who the shooter is. Wasn't there testimony that the medical people were trying to get the police out there so they could take care of this gentleman? I believe after a certain point they asked the police to leave, yes. But until then, the police were able to get a description of the events that occurred from Willie. Let's go to your second point. The motion for new trial. Okay. If this Court chooses not to reverse unreasonable doubt grounds, we ask that this Court remand the case for a new trial because the trial court erroneously denied the motion for new trial, which was supported by Kenyatta Martin's recantation testimony. An important thing to remember in this case is that the post-trial motion occurred three years after the trial was completed. In that amount of time, Kenyatta Martin became a religious man. But let me ask you this, Ms. Rubin. What is the effect, the net result of the recantation? Does it have any effect on the outcome of this trial one way or another? Absolutely. Tell me, in your words, what's the effect of the recantation? Well, the key evidence against Ashanti Young at trial was the voice identifications. As I said, nobody identified the shooters by sight. It was the witness that identified his voice, was he? That is correct. But Kenyatta Martin's post-trial testimony speaks of the reliability of both voice identifications because he explains post-trial that the witnesses collaborated, that they were prepped before they testified at trial so that all their testimony was consistent, and that the police urged both Kenyatta and Willie to identify, to raise their hands during the voice identification. Didn't he say there was a nudge? Yes, he said there was a nudge. Someone nudged him the first time he heard the voice. But I try as I would, I couldn't see where. He identified the voice more than one time. He claimed that he was nudged the very first time. That was not the testimony of the other witnesses that identified the voice, was it? Back to my original question, what is the effect of the recanting? That's what I'm trying to get at. Well, it takes his identification evidence and throws it out the window. So the state is just left with Willie's identification testimony, which is very incredible given the circumstances surrounding the lineup and that he doesn't actually say, I'm identifying a particular voice. Again, these were six simultaneous voices that he's listening to in a curtained room, and it's ASA Garcia's testimony that says they raised their hands at the same time Deshaunty Young was speaking, but all the other five participants were also speaking at the same time. It was his conclusion, and not surprisingly, because he knew who the suspect was. Are you saying all five people were speaking at the same time? Yes. And all the testimony at trial says, I believe Willie or Kenyatta said that it was a gang of people that they heard talking, that everybody was talking back and forth. Even ASA Garcia said that the majority of the six people were talking. So it was a conversation. It was a conversation, or conversations, plural, between six people. And, you know, with that background noise and with that backdrop, those witnesses were raising their hands. But, again, it's not certain whose voice they were actually identifying. It was ASA Garcia's opinion. There's a recantation in the testimony at the motion for new trial. Kenyatta testified. He got nudged once. That's the recantation I have in front of me. It doesn't say what that meant. He was cross-examined about this, and he didn't know what the nudge meant. He raised his hand. Did any policeman tell you that he had lied? Oh, no, no policeman told me that. Did you ever tell the police you were lying? No, I did not. Did you ever tell the state's attorneys that you were lying? No. Did any state's attorney tell you he was lying? No, he did not. No, they did not. I mean, so it's, you know, all this was in front of the trial court that heard the case, Jim Lynn, who's not, you know, as well-known as if nothing else, a very fair guy. That is true, but the state presented no evidence as to why Kenyatta Martin would come forward three years later. Because he saw God. He saw Jesus. They're very forgiving people, these Christians. And I mean that in both ways, satirical and truthful, that he feels badly four years after the event or three years after the event, he pointed a finger at somebody who he knew from the neighborhood, Sean, and he feels badly about that. That is very common among eyewitnesses, and that's an underlying reason why courts disavow or don't give a lot of credit to recantations, because people feel badly. And that's the very reason why it's trustworthy, because he felt bad because he wrongly accused a man whom he did not know was the shooter. And that makes sense. Could there be other reasons that he would come up with a recantation? There was no other reason presented at the trial. There was no, you know, the state had an opportunity to break down, you know, his recantation and, you know, present evidence maybe of motive or something else, but he received no benefit for testifying three years later except that he found God and he wanted to clear his conscience because he accused the wrong man. Counsel, let me ask you this. Even without the voice and advocations of Kenyatta and Willie at the police station, you still had Willie's idea of Sean's voice well before this, correct? And again, he said he knew him 20 times, but you're discounting that as well because you're saying that the argument made prior, right? Correct. He did, he actually never identified his voice until the lineup, but he said he thought that the shooter's voice may have been Sean from the neighborhood and he identified Sean out of a photo array. But the photo array is not indicative of guilt because, again, nobody ever saw the shooter's faces. Let me ask you, can the cumulative inference effect of all of these things, I guess what it comes down to is could any reasonable person, or prior fact, looking at these facts and circumstances under these, in this case, conclude that this man was guilty beyond a reasonable doubt? I mean, that's like the bottom line of what you're trying. And what about the fact that the gun, you know, the gun that was taken from the home invasion was found in the car, albeit true, not in the individual possession of this defendant, but in the car. The fact that he was found in this black SUV that people testified that Sean, are you saying all of these things are coincidences? I mean, it just seems like there are a lot of coincidences here that the jury would have to get past in order to adopt the argument that you're making. Well, reasonable doubt is more than coincidence. You know, I know that circumstantial evidence can support a finding of guilt if that circumstantial evidence is inculpatory. It's also true that a single eyewitness identification is enough even without circumstantial evidence. But here we don't have a good identification and we don't have inculpatory circumstantial evidence. We have bits and pieces that when put together still don't portray a picture of guilt. It's, you know, as if a vase fell and you couldn't put the pieces all back together. They're insufficient in and of themselves. And then when put together, the whole picture is insufficient. Can you move on to eavesdropping? Sure. The state does not dispute that the intercom system used in this case to overhear DeShanty Young's conversation fell under the definition of electronic device under the eavesdropping statute. The state also doesn't dispute that the police did not act with DeShanty Young's consent or under judicial authority when they overheard his conversation in the participation room. Finally, the state doesn't dispute that the statute applies to police conduct. The state only argues that the defendant had no reasonable expectation of privacy in the participation room because Detective Bach was also standing there. What's your response to that argument? Well, the definition of oral conversation under the statute is any oral communication between two or more people, quote, unquote. I see the specific narrow argument that they make that a person who's in custody for a crime in a police interrogation room has no reasonable expectation of privacy. What's your response to that? That the reasonable expectation is irrelevant to whether the statute was violated because the definition of oral conversation explicitly states that it's any oral communication between two or more people regardless, quote, unquote, of whether one or more of the parties intended their communication to be private. And this wasn't raised in the lower court, was it? It was not, but on appeal we argued plain error and ineffective assistance of counsel for not raising this below. This is a case, CESIA, from 2003, C-E-J-A, capital case, where people listening on intercom, the police being the police actually told them, why don't you keep it down, you know, we can't hear ourselves talk over here while you're confessing to this crime. And the Supreme Court pointed out there were officers there who got over here. Was there not an officer with these five guys as they sat around talking? There was, but in that case it was different because there was one officer. Right, so the five guys were sitting there, one of whom, your client, who refused to stand in a lineup to use one of his county jail jumpsuits. So that's why they have to close the thing. They're trying to get around to protect his rights, I suggest to you, which he does not have, to not participate in a regular viewing lineup. So to try and get around that, which they don't have to do, they close these things and now they have to listen to people. While that's going on, there's an officer standing with the five guys on the other side of the glass who could hear everything that was said. Is that correct? That is correct. However, that Sahas case was a case involving implied consent as opposed to a reasonable expectation of privacy. And in this case we have the record is clear that DeShanta did not consent to the over here. He didn't know that it existed. In Sahas, the police kept telling him, you know we can hear you, and there was a pinging sound and the speaker was visible. In this case, none of that. In fact, the officer said, well fine, he didn't want to participate, so we let him sit there until he struck up conversation. So they intentionally surreptitiously overheard the conversation as opposed to Sahas where they But the officer on the other side of the glass didn't surreptitiously over their conversation. Is that right? Correct. And neither did the four guys your client chose to speak with. They didn't surreptitiously hear your client's part of the conversation. Correct. But his expectation was that the witnesses, whose voice he did not want to give a sample to, could not hear him. So he gets to control everything then, whether he knows it or not, whether the police know it or not. He gets to say, I'm not. No. The police could have just waited. You can't listen to me while I talk. The police could have just waited. He talked to his attorney over the phone who told him not to participate in any kind of lineup procedure. The attorney talked to the police and the ASA over the phone. And they don't have a right to do that. However, they should not dispel with a reasonable, they should not forego following the law. Well, when police cars drive at 100 miles an hour with the lights flashing and they crash into other people, are they violating the law? Or should we let them go if they have to race after them or shoot at them? No, but there are certain circumstances under the eavesdropping statute. There are ten exemptions to the statute and one affirmative defense. So if the legislature intended to exclude this particular type of conduct, they would have put it in there. But they didn't. I mean, this is the kind of conduct that the statute specifically speaks of. The police were trying to be creative because your client would not cooperate. And I don't know whether he has, whether it's debatable whether he had a right to not cooperate since at that point he wasn't charged with that crime. But he chose not to cooperate. And so the police were trying to conduct and conclude their investigation. And it is true that they engaged in some creative ways of getting his voice heard by these witnesses. But I'm not sure that I agree with your response to the state's argument that did he have a reasonable expectation of privacy in that police interrogation room. You're saying it doesn't matter whether he did or he didn't. And I'm not sure that I agree with that. I think that the state makes a good argument that if you're in a police interrogation room, you don't have, and you're in custody, you can't argue that you have a reasonable expectation of privacy with respect to things that you say. But then the language in the statute explicitly stating that reasonable expectation of privacy is irrelevant would be ineffectual language. It had to have been in there for a reason. The legislature determined that it doesn't matter what the person's reasonable expectation of privacy is. The Illinois legislature is allowed to go beyond the Fourth Amendment. So the fact that they heard him through the intercom, that's a real, that's the issue here for you. If the intercom, let's just change the facts hypothetically. If the intercom for whatever reason was stuck open and the cops didn't make it open, and his voice was heard, could it be used then? According to the appellate court case law so far, yes. Because it would be inadvertent or sort of a mistake. But here it was. Not a mistake. There was no intention. I think the question really, had they opened a mail slot between the two, or had there been an opening like normally at county jail, you have little holes in the plexiglass. Had they had that instead, is your argument a contention upon the fact that an intercom was used as opposed to holes in the plexiglass? It has to be an electronic device that falls under the definition of eavesdropping. So it would not apply. Also, there has to be an element of intent. And here the facts of the case show that the police intentionally violated the statute. Counsel, can I ask you the legislative history of the eavesdropping statute? Is there anything to see in that history that specifically addresses this set of circumstances? I'm not aware of this particular set of circumstances. However, I do know that the statute was amended in 1994 to specifically include the language that it applies regardless of the person's reasonable expectation of privacy. So sometime in 1994 they decided that it was important to include that language so that it did apply under these circumstances. And the reason they included that language, it didn't include this set of circumstances. I'm not aware. I want you to save some time for reply. Okay. Thank you. Thank you. Ms. Smith. Good morning, Your Honors. May it please the Court. My name is Margaret Smith, and I'm Assistant State's Attorney representing the people of the State of Illinois. I want to let the Court know a few things regarding the identification procedures. The defense is arguing that there was no voice identification of defendant before the ID.  Both Willie and Kenneth were identified before the ID. Both Willie and Kenneth, prior to the voice identification procedure, step up and tell the police that they did recognize the voice of Sean. You have Willie identifying prior to that procedure. You have Willie coming up and saying, I know this individual. It's a guy I know named Sean from the neighborhood. He hangs out here. He was arrested in Harvey. They get a photo of him. They show it to Willie. Willie says, yeah, that's the guy. That's Sean. Kenneth also says he recognized the voice during the crime. You have the fact that Sean, Kenneth, is known as Sean. You have the fact that he closely matches the description both Willie and Kenneth gave to the police at the time of the offense. You have the fact that the cousin, Bobby, sees him the next day. Kenneth shows up, says, I'm Sean. He's driving the black SUV. He's not coming. Well, the record isn't clear why he comes, but he does come. He identifies himself as Sean. He's driving the black SUV. He knows that Willie's been hurt, and he's looking for DeAndre. We have the fact. So you have an identification of defendant, not just as some guy with a general description. They're saying, we know this guy is Sean. They described his build. They know this guy. So you have the fact that the victims knew that the defendant was the gunman prior to the voice identification procedure. You have the fact that the gun taken from James during the commission of the offense was recovered in the SUV the defendant was riding in. Your comment points out, although it was taken from the SUV, there was no evidence that he knew it was there or that he had it or that it belonged to him, was it? Or that he put it where they found it under the hood. Was there any evidence of that? Well, you have the officer, the Harvey police officer, saying he saw a defendant under the hood of that vehicle just moments before the gun was recovered. So you do have that testimony. You have defendant under the hood of that vehicle moments before the gun was discovered under the hood of that vehicle. You also have the fact that the gun was taken from the victim at the crime. And you have the fact that the victims identify the defendant, someone matching the defendant's description. They also say they know the defendant, and it's the voice of the defendant. So you do have a tie between this defendant and the gun. Counsel, let me ask you. And the SUV. Wasn't there some testimony that this officer from Harvey had prior connection to this defendant or knew the defendant and had some motive of some kind? There was testimony that he recognized the individual, yes. And that came in through the testimony as a way of knowing that he was the individual that was wanted on that warrant that prompted the stop. Well, I think the question really goes to that same officer testified in a different trial and from a judge limb, differently as to how it came about that he first saw this defendant near the Toyota. Okay. You're getting to whether or not he was sitting in the vehicle versus under the hood. Yes, that was defense counsel at trials attempted impeaching the officer, and the officer said, but actually that was not at the trial. That, I believe, was at the grand jury testimony. And that was in response to a specific question. And he did, in fact, testify to that. But he also said, look, if you look at my police report, I say that I saw him under the hood. So he wasn't impeached in that regard. So you don't think the impeachment was perfected? I do not. No. Thank you. So you clearly have the fact that the victims knew the defendant was the gunman and the gun taken from James during the commission of defense was in the SUV the defendant was riding. You have the fact that the Harvey police officer saw the defendant under the hood moments before the gun was recovered. You have the fact that the victims say, hey, we know the guy that was there. His name is Sean. He's from the neighborhood. We knew his voice. And guess what? DeShonta Young, his nickname is Sean. And he matches the physical description given by these victims. You have Willie and you have Bobby both identifying the defendant, photo of the defendant as the individual that they knew as Sean and who identified himself as Sean. So you have that connection. Can we talk about the voice identification? Can we move on to that in terms of being in the room and the witnesses listening? Okay. Yes. First of all, we do want to point out that the defendant concedes that he's forfeited this issue on review. The fact is there's nothing in the record as to the issue of eavesdropping because it was not raised at trial. It was not litigated at trial. We have nothing in the record on this issue. Furthermore, there's nothing, it wasn't raised there and it wasn't raised in the motion for new trial. So you have nothing in the record to indicate what happened. We do have that there was a police officer in the room with the defendant and the other gentleman. How do you respond to the defendant's argument that what you really have essentially is a jumble of voices? I think they used that term. They said the voice lineup was essentially a jumble of voices and also this also deems that so-called identification unreliable because it was six people having a conversation all at the same time and because the ASA who was doing that was making note of when the hands were raised. He had to peek from one side of the curtain to the other in order to figure out who was raising their hand and in response to which voice. Defendant's characterization of a jumble of voices is completely without support in this record. You have testimony by Willie Kenyatta and the detective and the assistant state's attorney regarding that conversation. They refer to it as a conversation, people speaking back and forth. Were there more than one person speaking? I would argue in this conversation we're having four people having essentially a conversation. We can each identify who's speaking at any given moment. It's not a jumble of voices. Willie said he could identify a voice clearly. He did identify it. Willie identified defendant's voice every time defendant spoke. Kenyatta identified defendant's voice every time defendant spoke. There's no testimony they identified anyone else's voices. ASA Garcia said he saw who they were identifying at that time and that defendant was speaking. There's no testimony about a jumble of voices. It's a conversation. Are different people speaking during a conversation? Yes. That's actually what's happening right here. Yet we are able to tell who's speaking at that time. Counsel, as far as the reliability of that testimony, though, and that evidence, I mean it wasn't really done in a scientific manner. The officer, again, was peeking around and people were raising their hands up and down. Was someone keeping count of when they raised their hand and what person was speaking? No, they were looking to see whether or not the individuals were identifying the defendant. They were working with the circumstances they had because of defendant's refusal and lack of cooperation. They did nothing wrong. Did they take notes, the police officers? No, they weren't. It says right from memory that I knew when he put his hand up? Yes. I mean they were focusing on whether or not who they identified. The ASA, the witnesses, and the police officer all were able to say they identified the defendant. There was no need for necessarily notes or what exactly the conversation was. The question was whether or not Willie and Kenyatta were identifying the defendant. The testimony by all of those individuals was every time defendant spoke, Willie and Kenyatta identified defendant saying I recognize the voice every time defendant spoke. There's nothing that's unclear. The defendant may not like the procedure employed. There's nothing wrong with the procedure employed and it was employed in this manner, this unusual manner because of defendant's actions. But there's nothing in the testimony to say that there was some equivocation. Every time defendant spoke, both of these individuals identified defendant as the person whose voice they recognized and ASA Garcia does not equivocate on that. There's nothing to support this argument of jumble of voices. Just because a couple people are in a conversation doesn't mean you can't understand anything anyone's saying or identify who's speaking. Can you address the recantation? Yes. Again, defendant has forfeited review of this issue because the issue was not litigated below. The record is silent. Pardon me. On the motion for new trial. I'm sorry. I apologize. On the motion for new trial, what you have here is the question of the trial court held hearing, assessed the credibility of the witnesses, considered the fact that the people impeached the new evidence and concluded that the new evidence was not of such conclusive character as to change the result on retrial. There's no abusive discretion here. The defendant is trying to argue that the fact that Kenyatta came forward and became a Christian and that was his motivation makes it all the more believable. The fact is that recantation are inherently unreliable, especially when it involves confession to perjury. That's exactly what you have with Kenyatta. He's saying, I perjured myself at trial, but I'm telling the truth here. Recantation testimony is inherently reliable. Would it make it more reliable, though? Who would be willing to say they perjured themselves knowing that there are penalties for that if it wasn't the recantation isn't true? Well, you can understand that that's an argument. I understand your argument, but I'm not sure that you want to use the fact that he perjured himself to support your argument. Well, that's what the case law says, that recantation testimony by anyone is inherently reliable, but all the more so where it involves a confession of perjury. Also, the fact that at the time Kenyatta testified at trial, he didn't have any convictions. He wasn't charged with anything. He had no convictions. At the time he testified regarding the recantation, he was a felon. He was a convicted felon. So you have both those facts. Recantation testimony is inherently reliable, especially when it relies on a confession of perjury, and the fact that he was a convicted felon at the time of his recantation testimony. So you have the fact that the trial court held a hearing, assessed the credibility of all the witnesses at that hearing, including Kenyatta. Didn't believe Kenyatta. And the court said, look, this comes down to the sufficiency of the evidence. The jury heard Kenyatta's original testimony and believed it. I heard Kenyatta's recantation testimony, and I don't believe it would change the result in such a conclusive character that it would change the result on retrial. Also, can I ask you, what's the time frame between his testimony at trial and the recantation? Do you recall? It was about three years. Three years. Yes. Thank you. There are no further questions? There are none. For these reasons, and those stated in our brief, the people respectfully request that this court affirm defendant's convictions and sentences. Ms. Rubio, very briefly. I just would like to make a few points. In terms of my characterization of the identification procedure as a jumble of voices, while the witnesses don't actually use the exact word jumble, one of the witnesses did say that he heard, quote, unquote, a gang of voices. I wouldn't describe our exchange as being a gang of voices. I would describe this as being a conversation, but a gang of voices is something more. And ASA Garcia also testified that the majority of the six people were speaking. You know, this is a situation where, you know, they say that every time the witnesses are raising their hands, DeShonta Young's speaking, but the testimony also shows that other people, ASA Garcia admits that, yes, he was speaking, but other people were also speaking at the same time. This is a situation compared to something like you hear, you know, the elevator man's voice every day when you come, you know, in exchange, you know, you say hello, and then if you were expected to identify my voice 12 days from now, in amongst six simultaneous voices, you know, we'd argue that that's an unreliable set of circumstances to support the identifications. And finally, as to the recantation evidence, the fact that he is now presenting himself and exposing himself to prosecution of perjury does go to the credibility of his new testimony, and we can compare this to, you know, there are cases that hold that recantation evidence could be incredible, but there are also cases where recantation evidence is believed based on the Supreme Court case, where the prime witness at trial admitted post-trial that her testimony was perjured. You know, under this set of circumstances, Kenyatta gains nothing by coming forward three years later to set the record straight. And for these reasons, we ask that the court reverse DeShonta Young's conviction or remand for a new trial. Thank you. This case will be taken under advisement.